UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

Case No. 11-20699

Honorable Nancy G. Edmunds

v.

Leo Earl Sharp et al.,

    Defendants.

                                               /

**OPINION AND ORDER DENYING DEFENDANT LEO EARL SHARP'S MOTION TO SUPPRESS [177]**

Before the Court is Defendant Leo Sharp's motion to suppress one hundred and four kilograms of cocaine that two officers discovered and obtained from Defendant's truck during a traffic stop that occurred on October 21, 2011. (Dkt. 177.)

Defendant argues that he did not commit a traffic violation that entitled the officer to pull him over and, given the lack of a violation, that the officer did not have any legal basis to stop, detain Defendant for longer than necessary, and search Defendant's truck. (Def.'s Mot. at 6, 8.) Defendant also argues that the dog that alerted to the cocaine was not well-trained or sufficiently reliable to justify a warrantless search. (*Id.* at 12.)

The Government responds that the officer legally stopped Defendant for traffic violations and even if Defendant had not violated any traffic laws, the officer still had probable cause, based on the collective knowledge doctrine, to stop, detain, and search Defendant's truck. (Dkt. 188.)

On March 28, 2013, the Court held an evidentiary hearing. Because the Government has presented credible evidence that the Drug Enforcement Agency agents investigating the drug organization at the heart of this case obtained probable cause to search Defendant's truck bed and that the DEA agents sufficiently informed Officer Craig Ziecina about the possible presence of drugs in Defendant's truck, the Court finds that Ziecina had the requisite probable cause based on the collective knowledge doctrine to search the truck bed. For the reasons below and stated on the record at the hearing, the Court DENIES Defendant's motion to suppress.

I. **Facts**[1]

At the hearing, DEA agent Jeff Moore testified about the investigation that gave rise to this case. Moore tested that he had been investigating drug activity by an organization for several years when, in January or February, 2011, he got his first big lead. This lead occurred when DEA agents executed a search warrant at Ramon Ramos's home and found several thousands of dollars in drug proceeds and drug ledgers. Ramos, an alleged member of the organization, decided to cooperate with the DEA. At the hearing, Moore testified consistently with the facts as outlined by the Government in its motion.

> [I]n July 2011, the Drug Enforcement Administration (DEA) - Detroit began an investigation into a drug trafficking organization headed by Jose Roberto-Lucero-Bustamante and Armando Dias-Lucero (hereinafter the "Bustamante DTO"). Between July and October 2011, DEA - Detroit developed and worked with a confidential informant [(Ramon Ramos)] within the Bustamante DTO who provided information concerning ongoing narcotics operations and who wore audio and video equipment to record meetings between various DTO members. By October 21, 2011, the confidential informant's

---

[1] The Government states that since the motion to suppress presents a mixed question of law and fact it anticipates calling between two to five witnesses during the evidentiary hearing.

cooperation had led to the seizure of $1,956,420 on August 6, 2011; the seizure of 100 kilograms of cocaine on September 11, 2011, DEA obtaining authorization for wire interception of three different telephones, and numerous search authorizations for exact longitude and latitude coordinates for the cellular phones of suspected co-conspirators, including [Defendant's] cellular phone. DEA - Detroit was in possession of a video of a meeting that occurred on September 17, 2011, recorded by the confidential informant, that showed [Defendant], who resides in Indiana and Florida, present in co-defendant Theodore Czach's warehouse with large duffel bags being placed in [Defendant's] truck, the same truck [Defendant] was driving at the time of the challenged stop. [According to the confidential informant, these bags were filled with narcotics proceeds which [Defendant] was to deliver to the southwest border of the United States.] The confidential informant identified [Defendant] as the [primary] narcotics courier for the DTO and that he used this particular black truck as the means for carrying narcotics and narcotics proceeds. The confidential informant also related to DEA - Detroit that [Defendant] would be bringing the next shipment of cocaine to Michigan. Finally, the cell phone location data for [Defendant's] phone placed him in North Carolina with defendant Octavio Gamez (who resides in California) on October 14, 2011, then traveling across [the] country to Arizona, and eventually heading toward Michigan. [Intercepted wire communications between Gamez and co-defendant Pedro Delgado-Sanchez during this time frame led DEA - Detroit special agents to believe that [Defendant] had picked up narcotics proceeds from Gamez in North Carolina to deliver in Arizona and that [Defendant] would be picking up a shipment of narcotics to be delivered here in Michigan.

As the DEA special agents and task force officers tracked [Defendant's] movements across country in the week leading up to October 21, they believed that [Defendant's] actions were consistent with the encrypted phone calls they were intercepting and their belief that he was bringing a narcotics shipment to Michigan. The DEA wanted to stop [Defendant's] vehicle, but also wanted to disguise it as a mere traffic stop so as not to divulge the larger investigation and the existence of wire interceptions on the other DTO members' telephones. Consequently, DEA task force officers David Powell, a member of the DEA enforcement group investigating the Bustamante DTO, called Michigan State Trooper Craig Ziecina approximately a day or two before [Defendant's] expected arrival in Michigan. Trooper Ziecina remembers [O]fficer Powell relate to him that DEA had a confidential informant within a Detroit drug trafficking organization and that DEA had information that an old man driving a pickup truck would be brining a load of cocaine into Michigan. Officer Powell asked the trooper to be aware of this individual and to see if the individual commits any traffic offenses that would warrant a traffic stop and to establish his own probable cause to search [Defendant's] truck if possible. Also in the day or two before the stop, DEA

>task force Adam Tardiff coordinated with Michigan State Trooper Matthew Unterbrink, a canine officer, to have his canine in the area so it could be utilized in investigating [Defendant's] vehicle. Trooper Unterbrink remembers [O]fficer Tardiff stating that DEA had an ongoing wiretap investigation that revealed an older white male coming into Michigan with a load of cocaine.

(Gov't's Mot. at 3-5.)

The Government then states that on Friday, October 21, 2011, "law enforcement officers from DEA - Detroit began surveillance of [Defendant's] truck near the Michigan - Indiana border. They followed [Defendant] across the state of Michigan and contacted Trooper Ziecina as [Defendant] approached the trooper's location." (Gov't's Mot. at 5.) Moore testified to the facts as the Government has presented them.

Trooper Ziecina testified at the hearing as well. He testified consistently with his report, as outlined below, save for the DEA information., which he did not include in the report because he was concerned about compromising an ongoing drug investigation. At the hearing, Ziecina testified that DEA Task Force Agent Powell called him and told him that an older man was bringing a large undetermined amount of narcotics into Michigan and asked Ziecina to be on notice and to conduct a traffic stop to search the vehicle for drugs. Ziecina testified that he had conducted several of these types of stops for DEA agents before. Ziecina noted that Powell asked him to pull over Defendant, if possible, for a traffic violation and attempt to establish probable cause to search the truck independent from the information Powell gave him. Ziecina stated that, on October 21, 2011, Powell contacted him and told him that the older man with the alleged narcotics would be coming through Michigan. Ziecina came into work several hours early and waited for a call from Powell. When Powell contacted Ziecina, Powell gave him Defendant's vehicle description and

4

location. Ziecina waited until he observed the truck, a black Lincoln pick up truck, and conducted the stop.

Trooper Ziecina filled out a report of the incident. (Def.'s Mot., Ex. A, Ziecina Report.) Ziecina stated that, on October 21, 2011, while in his patrol car viewing traffic east-bound on I-94 in Sylvan Township, he saw a black truck pass by him. (*Id.*) The truck was traveling in the left lane and "was following too closely" to the car in front of it for highway speeds. (*Id.*) The truck also remained in the left lane, despite the right lane being open. Ziecina stated that following too closely to the other car and remaining in the left lane were traffic violations. Ziencina decided to pursue the truck and initiate a traffic stop. (*Id.*) He turned on his emergency lights. (*Id.*) Defendant signaled, changed lanes, but failed to stop immediately and continued approximately a half of a mile before he stopped and entered the rest area. (*Id.*)

As Defendant pulled into the rest area, he stopped his truck, opened his door, and exited it. (Ziecina Report.) On the video recording, before Ziecina approached, Defendant exited the car and asked, "what's going on officer?" (Def.'s Mot., Ex. B.) Ziencina asked why Defendant hopped out of the car and then proceeded to ask Defendant for his license and registration. (*Id.*) Ziecina stated that Defendant began to ramble about his age and took a very long time to produce the requested information. (Zeicina Report.) Zeicina then patted down Defendant. Ziecina stated that Defendant talked about irrelevant issues and his age, Ziecina believed, to evade Ziecina's line of questioning. (*Id.*) Ziecina asked about Defendant's travel plans. (*Id.*) Defendant stated that he was driving from Iowa, but that he did not live in Iowa. He stated that he created plant hybrids for a living. Ziecina stated that Defendant was unable to locate the truck's paperwork. (*Id.*)

5

Ziecina stated that he then asked Defendant to go to the patrol car with him, so that Ziecina could check out Defendant's driving status. (Ziecina Report.) Zeicina stated that Defendant did not close his door and appeared very nervous–he was touching his face, looking around erratically, and his carotid artery was visibly beating. (*Id.*) Zeicina again asked Defendant about his travel plans. (*Id.*) Defendant answered that he was on his way to Detroit, Michigan and that he had spent the last several days in Iowa at his niece's house. (*Id.*) He added that he frequently traveled to Iowa to take care of "blood relatives." Ziecina stated that Defendant was unsure of the day of the week, stating the day was Saturday, when the stop occurred on a Friday. (*Id.*) Ziecina checked Defendant's license and found that he had surrendered his Iowa license and that Defendant did not have any license from any of the other states he mentioned that he lived in: Florida, Indiana, Iowa, and Hawaii. (*Id.*)

Ziecina stated that he informed Defendant of his traffic violations and then began asking him about his trip to Michigan. (Ziecina Report.) Defendant stated that he was headed to Dearborn, Michigan, to visit an old war buddy. (*Id.*) The war buddy's name was Vanvelder, although Defendant did not state what the first name was when asked. (*Id.*) Defendant then indicated that he did not know Vanvelder's address or his phone number. (*Id.*) Ziecina found that this information was suspicious. (*Id.*) Defendant stated that he was planning on staying in Michigan for a couple of days and would most likely stay with Vanvelder, although he had not contacted him prior to the trip. (*Id.*)

Ziecina stated that Defendant's statements increased his suspicion and so he asked Defendant about his luggage and belongings. (Ziecina Report.) When Ziecina asked whether Defendant had any luggage, Defendant responded, "basically . . .the answer is

6

sure." (*Id.*) Defendant stated that he had "very little" clothes and did not change clothes a lot. (*Id.*, Ex. B.)

Ziecina then asked whether Defendant was responsible for everything that was in his car; Defendant responded "of course." (Ziecina Report.) Ziecina asked Defendant if he had various drugs, large amounts of currency, weapons, or anything else illegal in the truck. (*Id.*) Defendant responded "no."

Ziecina then requested Defendant's consent to search the car; Defendant questioned whether he had a choice. (Ziecina Report.) Ziecina said that Defendant did have a choice. Defendant then discussed his need to get to Detroit and that he was in a hurry to get there before the sun set. (*Id.*)

Ziecina called Trooper Unterbrink, a K-9 officer. (Ziecina Report.) A few minutes later, Trooper Unterbrink arrived and performed a K-9 inspection. (*Id.*) After some preliminary sniffing, the dog alerted at the truck bed, which was locked. (*Id.*) Defendant stated that some clothes were in the back. (*Id.*) Ziecina informed Defendant about the positive K-9 alert and that they would be performing a probable cause search of the truck bed. (*Id.*) Ziecina stated that, when he opened the truck, Defendant said "oh my God." (*Id.*) The audio recording confirms the statement. Ziecina discovered four large duffel bags and one smaller multi-colored bag in the truck bed. (*Id.*) Ziecina stated that the K-9 alerted to drugs in the bag. (*Id.*) Ziecina said that he then opened one bag, discovered drugs, went back to his patrol car and arrested Defendant. (*Id.*) Ziecina stated that Defendant said "just kill me and let me leave this planet." (*Id.*) Ziecina then stated that he continued the rest of the search of the truck. (*Id.*) After that, Ziecina took Defendant to the police station. (*Id.*)

**II. Analysis**

Defendant argues that the traffic stop violated his Fourth Amendment rights.

"The Fourth Amendment forbids law enforcement officers from making unreasonable searches and seizures, and its protections extend to brief investigatory stops of . . . .vehicles that fall short of traditional arrest." *United States v. Lyons*, 687 F.3d 754, 762-63 (6th Cir. 2012) (quotation marks and citation omitted). For a traffic stop to be lawful, "an officer must posses either probable cause of a civil infraction or reasonable suspicion of criminal activity." *Id.* at 763 (citations omitted).

A court must determine whether the stop was "justified at its inception," and then "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) (citations omitted).

"A valid [traffic] stop must be 'limited in scope and duration.'" *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) (citations omitted). To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* (citations omitted). To be limited in duration, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* (citation omitted).

### A. Ziecina had probable cause to stop Defendant based on the collective knowledge doctrine

The Government argues that Officer Ziecina had probable cause to stop Defendant for narcotics possession. (Gov't Resp. at 9.) The Court agrees and therefore does not need to address the reasonable suspicion standard or probable cause of a traffic violation or the drug sniff/alert the canine and canine officer conducted.

Courts weigh the reasonableness of a traffic stop by the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) "and its progeny." *Lyons*, 687 F.2d at 763 (citation omitted).

An officer may have probable cause to stop a vehicle based on information he learned from other officers or agents. The "collective knowledge" doctrine or the "fellow officer" rule "recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *Lyons*, 687 F.3d at 766-767 (citations omitted). The doctrine is necessary because officers "must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information." *Id.* (citation omitted, insertion in *Lyons*.). Courts therefore "impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Id.* (citations omitted). The doctrine applies wherever an officer executes a traffic stop and vehicle search "at the request of an officer who possesses the facts necessary to establish reasonable suspicion." *Id.* (citation omitted) (applying the reasonable suspicion standard). The doctrine is flexible, it operates through police bulletin or dispatch, direct or indirect communication. *Id.* "By imputing the investigating officer's suspicions onto the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine 'preserves the propriety of the stop' and avoids crippling restriction on [] law enforcement." *Id.* (citation omitted).[2]

---

[2]The Sixth Circuit has noted that the collective doctrine is not without its restrictions. *Lyons*, 687 F.3d at 766. "[A] traffic stop based on collective knowledge must be supported by a proper basis and must remain reasonably related in its scope to the situation at hand." *Id.* (citation omitted).

9

Three separate inquiries help clarify whether the collective knowledge doctrine applies: (1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Lyons*, 687 F.3d at 767 (citations omitted).

Here, the Government argues that Officer Ziecina had all the information he needed to act: a well-founded request by the DEA that he execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle. (Gov't's Resp. at 10.) The Government also states that Officer Ziecina "acted in objective reliance on the information received from [O]fficer Powell; [O]fficer Powell and the rest of the DEA team investigating the Bustamante DTO had facts supporting the DEA's suspicion that [Defendant] was carrying a load of narcotics; and the stop was no more intrusive than would have been permissible for the officer requesting it." (*Id.*)

The Government further argues that with Ziecina had probable cause to search the truck from the onset of the stop. (Gov't's Resp. at 10.) The Government points to *United States v. Perkins*, 994 F.2d 1184 (6th Cir. 1993), to support its argument that the collective knowledge doctrine gave Ziecina probable cause to not only stop the truck, but also to search the truck for drugs. There, the Sixth Circuit held that an officer had "ample probable cause to stop and search [a] vehicle" when an officer had received information from an agent who had "good information" about the defendants' intentions to transport drugs. *Perkins*, 994 F.2d at 1187.

Here, Moore testified that he had video showing members of the drug organization loading duffel bags of drugs or money into Defendant's truck bed on a separate occasion

and that a reliable cooperating witness then told him that Defendant would be traveling to Michigan to make drug and cash deliveries near the October 21, 2011 date. Moore therefore had probable cause to search the truck bed. Given that Ziecina testified that Task Force Officer Powell told him of the drugs in the vehicle and that an old man was driving the vehicle, he had similar information as the officer in *Perkins* and therefore, based on the collective knowledge doctrine, had probable cause to search for drugs.

### III.   Conclusion[3]

For the above-stated reasons, the Court DENIES Defendant's motion to suppress.

SO ORDERED.

                                       s/Nancy G. Edmunds
                                       Nancy G. Edmunds
                                       United States District Judge

Dated:  April 1, 2013

---

[3]Defendant has also challenged the duration of the stop. Viewing the episode in its entirety, the stop and search did not violate Defendant's Fourth Amendment rights. The questioning was reasonable–Ziecina initially asked questions solely related to Defendant's license and registration. When Defendant could not produce that information, Ziecina probed further, he asked about travel plans. And when Defendant gave odd answers, Ziecina questioned about luggage, and then about anything illegal in the truck. Those answers combined with Defendant's nervous demeanor that Ziecina reported he observed gave Ziecina probable cause to suspect illegal activity. Given the information that Ziecina had from the DEA agent, Ziecina had reason to search the car and permissibly called for a K-9 officer and drug dog for further independent evidence of possible drugs. While the Court notes that the duration of the stop appears long, the Court finds that, as a whole, the stop was not too long in duration. Ziecina's actions and the time he took were a result of Defendant's answers to Ziecina's questions. Those uncertain answers allowed Ziecina to probe further to establish further attempt to establish further independent probable cause to search the truck and tell Defendant to remain in the patrol car. *See United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) ("the proper inquiry whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*–including any prolongation due to suspicionless unrelated question–was reasonable.").

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 1, 2013, by electronic and/or ordinary mail.

                                              s/Carol A. Hemeyer
                                              Case Manager